[No. S054783. Nov. 9, 1998.]

JUNE McKEON, Plaintiff and Appellant, v.
MERCY HEALTHCARE SACRAMENTO, Defendant and Respondent.

322

COUNSEL

Bradley G. Booth, April Powell-Willingham, Porter, Scott, Weiberg & Delehant and Ned P. Telford for Plaintiff and Appellant.

Quackenbush & Quackenbush and William C. Quackenbush as Amici Curiae on behalf of Plaintiff and Appellant.

Foley, Lardner, Weissburg & Aronson, Foley & Lardner, Stephen W. Parrish and Michael J. Sieradzki for Defendant and Respondent.

Steven Drapkin, Proskauer, Rose, Goetz & Mendelsohn, Sidley & Austin and Jeffrey A. Berman as Amici Curiae on behalf of Defendant and Respondent.

OPINION

**WERDEGAR, J.**—The California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA) generally prohibits work-related discrimination by employers. FEHA exempts religious entities, however, by excluding from the definition of employer "a religious association or corporation not organized for private profit." (Gov. Code, § 12926, subd. (d)(1).) In this employment discrimination case, the Court of Appeal held the exemption inapplicable to a nonprofit public benefit corporation that owns and operates hospitals controlled by the Roman Catholic Church. As the Court of Appeal construed the exemption too narrowly, we reverse.

## I.

Plaintiff June McKeon, a registered nurse employed by defendant Mercy Healthcare Sacramento (MHS), sued defendant for employment discrimination under Government Code section 12940, a part of FEHA. Section 12940 declares: "It shall be an unlawful employment practice . . . [¶] (a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, or sex of any person, . . . to discriminate against the person in compensation or in terms, conditions or privileges of employment." McKeon, an African-American woman, alleges MHS discriminated against her on account of race and gender by hiring two White males for supervisory nursing positions while intentionally stalling her own application for promotion.

MHS moved for summary judgment under Government Code section 12926, subdivision (d)(1), which excludes from FEHA's definition of employer "a religious association or corporation not organized for private profit." In response to the motion, McKeon argued MHS was not entitled to invoke the religious-entity exemption (*ibid.*) because MHS was organized under the Nonprofit Public Benefit Corporation Law (Corp. Code, § 5110 et seq.) rather than the Nonprofit Religious Corporation Law (Corp. Code, § 9110 et seq.). Relying entirely on this single legal argument, McKeon submitted no declarations or documentary evidence and admitted the assertions set out in MHS's separate statement of undisputed facts. Accordingly, the facts set out below are drawn from MHS's separate statement.[1]

MHS hired McKeon in November 1990, as a charge nurse at Mercy General Hospital in Sacramento. Mercy General Hospital (formerly Mater Misericordiae (Mother of Mercy) Hospital) was established by the Sisters of Mercy in 1897. MHS was formed in 1987 to provide management and support functions for the Sacramento area Mercy facilities. MHS is sponsored by three orders of the Roman Catholic Church: the Sisters of Mercy, Burlingame; the Sisters of Mercy of Auburn; and the Sisters of St. Dominic of the Most Holy Rosary of Adrian, Michigan. The sponsoring orders "are organized under the auspices, and as an integral part, of the Roman Catholic Church for the purpose of furthering the Church's teachings and tenets." "MHS's mission is to continue to incorporate the healing ministry of the Church and the values and principles of the Ethical and Religious Directives for Catholic Health Facilities into the practice of medicine." The Ethical and Religious Directives, which require fidelity to the church's teachings, are issued by the National Conference of Catholic Bishops. MHS's articles of incorporation and bylaws reflect its religious mission.

---

[1]All further unattributed quotations are to this separate statement of undisputed facts.

Most of the financing for the original Mercy Hospital buildings, as well as for subsequent additions and new buildings, was contributed by members of the Roman Catholic faith. The church has been involved in all dedications of new Mercy buildings and facilities for over 75 years. "The facilities are dedicated for the exclusive purpose of healing, and holy water is sprinkled on the property as a symbolic act setting it aside as a sacred space for healing."

MHS's articles of incorporation recite that MHS is a "nonprofit public benefit corporation . . . not organized for the private gain of any person." The articles reflect MHS's purpose of providing for the "reception and care of the sick, injured and disabled" in a manner that "support[s] the religious and charitable mission of the Sisters of Mercy of Auburn" and the other sponsoring orders. MHS's bylaws require that its activities be "carried on subject to the moral and ethical principles of the Roman Catholic Church," and that "[n]o activities or procedures shall be permitted within the facilities owned by the corporation which are contrary . . . to the Ethical and Religious Directives." The sole member of MHS is Catholic Healthcare West, a nonprofit public benefit corporation. The members of Catholic Healthcare West must belong to the sponsoring religious orders. All of MHS's directors, two of whom must belong to the sponsoring orders, must subscribe to the Ethical and Religious Directives. The president of MHS belongs to the Sisters of Mercy. Each officer of MHS must adhere to Catholic standards of ethical and moral conduct in carrying out his or her duties and must fully and unequivocally support the mission and philosophy of the Sisters of Mercy. Employees of MHS are also required, as a condition of employment, to comply with the mission and philosophy of the Sisters of Mercy and to participate in an orientation program that includes an introduction to and instructions regarding that mission and philosophy.

MHS admits patients of all faiths. The Ethical and Religious Directives, however, proscribe all forms of euthanasia, nontherapeutic sterilization, nontherapeutic abortions, and artificial insemination. Each MHS hospital has a designated chaplaincy service, which performs Mass three to four times a week, and offers communion daily to both patients and staff. MHS places crucifixes in all common areas of each facility and includes religious emblems and references in its correspondence and publications.

MHS is exempt from federal taxation as a "[c]orporation[] . . . organized and operated exclusively for religious, charitable . . . or educational purposes" (26 U.S.C. § 501(c)(3)) based on a group ruling issued by the Internal Revenue Service to all religious institutions appearing in the Official Catholic Directory. The group ruling encompasses all institutions "controlled" by

the Catholic Church. MHS is also exempt from state income and property taxation under similarly worded statutes. (Rev. & Tax. Code, §§ 214, 23701d.)

The superior court granted MHS's motion for summary judgment. The court found that MHS was exempt from FEHA under Government Code section 12926, subdivision (d)(1). The Court of Appeal reversed. Construing FEHA broadly, and its religious-entity exemption narrowly, to further the "purpose of eliminating discrimination in the workplace against those in protected classifications," the court concluded the exemption applies only to entities organized under the Nonprofit Religious Corporation Law (Corp. Code, § 9110 et seq.) and, thus, not to MHS. We granted review.

II.

■ McKeon's opposition to MHS's motion for summary judgment raised a single issue: Must an entity, in order to claim exemption from FEHA as a "religious association or corporation" (Gov. Code, § 12926, subd. (d)(1)), organize under Corporations Code section 9110 et seq. as a nonprofit religious corporation? We conclude the answer is no.

Two provisions of FEHA (Gov. Code, § 12900 et seq.) are relevant to the question before us. Section 12940 prohibits discrimination by an "employer" in these words: "It shall be an unlawful employment practice . . . [¶] (a) For an employer, because of the race . . . or sex of any person, . . . to discriminate against the person in compensation or in terms, conditions or privileges of employment." Section 12926, subdivision (d), generally defines employer to "include[] any person regularly employing five or more persons, or any person acting as an agent of an employer, directly or indirectly . . . ." Section 12926, subdivision (d)(1), narrows the general definition of employer to create the following exemption for religious entities: " 'Employer' does not include a religious association or corporation not organized for private profit."

McKeon would have us construe the religious-entity exemption (Gov. Code, § 12926, subd. (d)(1)) as applying only to corporate entities organized under a particular California law, namely, the Nonprofit Religious Corporation Law (Corp. Code, § 9110 et seq.). The exemption does not apply to MHS, McKeon argues, because MHS is incorporated under the Nonprofit Public Benefit Corporation Law (Corp. Code, § 5110 et seq.). In fact, neither the exemption's language nor its history supports such a conclusion.

The language of the religious-entity exemption does not seem problematic or difficult to interpret. In the statute, one reads simply that " '[e]mployer'

does not include a religious association or corporation not organized for private profit." (Gov. Code, § 12926, subd. (d)(1).) To take advantage of the exemption, an entity apparently need only be "religious" and "not organized for private profit." (*Ibid.*) Read literally, these words are so broad as to exempt even *unincorporated* entities of the requisite "religious" character; this is the natural inference from the disjunctive phrase "association *or* corporation." (*Ibid.*, italics added.) To read the statute as McKeon would read it—to require incorporation under a particular California law—makes no sense when the statute does not appear to require incorporation at all. McKeon's reading of the statute would also deny its benefit to religious entities incorporated under the laws of other states. We have no reason to believe the Legislature intended to discriminate among religious entities in this way.

History also contradicts McKeon's proposed interpretation of the religious-entity exemption. (Gov. Code, § 12926, subd. (d)(1).) At the time the Legislature first enacted the exemption's current language, the Nonprofit Religious Corporation Law (Corp. Code, § 9110 et seq.) did not yet exist; the Legislature could not have intended to require religious entities who wished to avail themselves of the exemption to incorporate under a nonexistent law. The exemption began as part of the Fair Employment Practice Act (Lab. Code, former § 1410 et seq., added by Stats. 1959, ch. 121, § 1, p. 1999, and repealed by Stats. 1980, ch. 992, § 11, p. 3166), the statutory predecessor of FEHA. In its original form, the exemption excluded from the definition of employer any "social club, fraternal, charitable, educational or religious association or corporation not organized for private profit." (Lab. Code, former § 1413, subd. (d), added by Stats. 1959, ch. 121, § 1, p. 2000.) In 1977 the Legislature deleted the references to social, fraternal, charitable, and educational entities, thus giving the statutory language its current form. (Stats. 1977, ch. 1019, § 1, p. 3055.) The Nonprofit Religious Corporation Law (Corp. Code, § 9110 et seq.)—the statutory scheme to which McKeon would find an implicit reference in the religious-entity exemption—was not enacted until 1978 (Stats. 1978, ch. 567, § 7, p. 1894) and did not take effect until 1980 (*id.*, § 11, p. 1924).

Today, a religious entity that wishes to organize as a nonprofit corporation may do so under either the Nonprofit Religious Corporation Law (Corp. Code, § 9110 et seq.) or the Nonprofit Public Benefit Corporation Law (*id.*, § 5110 et seq.). Before 1980, there was no choice; the now-repealed General Nonprofit Corporation Law (Corp. Code, former § 9000 et seq., repealed by Stats. 1978, ch. 567, § 9, p. 1924, operative Jan. 1, 1980) provided the only available statutory vehicle. So it was in 1977, when the Legislature selected the words "religious association or corporation not organized for private

profit" (see Lab. Code, former § 1413, subd. (d), as amended by Stats. 1977, ch. 1019, § 1, p. 3055) to describe the type of entity entitled to an exemption from the state's employment discrimination law. The Legislature could not have meant these words to describe a form of incorporation that did not yet exist. McKeon would have us believe the words acquired a different meaning in 1980, when the revisions to the Corporations Code took effect and the religious-entity exemption was readopted without change as part of FEHA (Gov. Code, § 12926, former subd. (c), now subd. (d)(1), added by Stats. 1980, ch. 992, § 4, p. 3143), as were other employment discrimination provisions of the Fair Employment Practice Act. (See *Robinson* v. *Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 235 & fn. 9 [5 Cal.Rptr.2d 782, 825 P.2d 767].) Nothing in FEHA or the Corporations Code, however, notified religious entities they might be required to incorporate or, if already incorporated, to change their form of corporate organization in order to continue to enjoy exempt status under the employment discrimination laws.

The Court of Appeal, which rejected these conclusions and agreed with McKeon, concluded that FEHA (Gov. Code, § 12900 et seq.) and the Nonprofit Religious Corporation Law (Corp. Code, § 9110 et seq.) were adopted "[v]irtually contemporaneously" and that "[t]hese parallel statutory developments tend to support the conclusion that the religious exemption . . . applies only to those religious corporations organized under the Nonprofit Religious Corporation Law." The argument depends on a factual error: FEHA and the Nonprofit Religious Corporation Law were not drafted or adopted contemporaneously. As noted, the Legislature first enacted the current language of the religious-entity exemption in 1977, one year before enacting the Nonprofit Religious Corporation Law and three years before the latter became effective. McKeon points out that the project to reorganize the General Nonprofit Corporation Law, out of which the Nonprofit Religious Corporation Law emerged, began in 1976. (See 5 Assem. J. (1979-1980 Reg. Sess.) p. 9002.) The coincidence, however, has no apparent significance. The legislative history of the 1977 act that added the current language of the religious-entity exemption is utterly devoid of reference to the as-yet-unenacted Nonprofit Religious Corporation Law, and the legislative history of the latter is devoid of reference to the former. Indeed, the Legislature had no reason to consider the impact of proposed changes to the Corporations Code on FEHA's religious-entity exemption, since the latter, by its terms, appears to apply even to unincorporated associations. (Gov. Code, § 12926, subd. (d)(1) ["religious *association or* corporation not organized for private profit" (italics added)].)

McKeon next contends that the Fair Employment and Housing Commission (Commission) has interpreted the religious-entity exemption in the

manner she proposes, and that we should defer to the Commission's interpretation. In fact, McKeon's argument stems from a misreading of the Commission's decision in *Department of Fair Employment and Housing* v. *Bohemian Club* (1988) No. 88-01, FEHC Precedential Decisions 1988-1989, CEB 1 (*Bohemian Club*).

In *Bohemian Club*, the Commission considered a claim of gender-based employment discrimination against a private club. The club, which was incorporated as a nonprofit mutual benefit corporation (see Corp. Code, § 7110 et seq.), contended it was exempt from FEHA under Government Code section 12926, subdivision (d)(1). The club interpreted the phrase "religious association *or* corporation not organized for private profit" (*ibid.*, italics added) as exempting corporations not organized for private profit, whether or not of religious character. The Commission rejected the argument, concluding the term " 'religious' modifies both 'association' and 'corporation not organized for private profit.' Had the Legislature intended non-profit corporations to be a separate class of exempt entities from religious associations," the Commission reasoned, "it would have placed a comma after 'religious associations.' It did not do so." (*Bohemian Club*, *supra*, No. 88-01, FEHC Precedential Decs. 1988-1989, CEB 1, at p. 13.)

The decision in *Bohemian Club* does not dispose of the case before us. In that decision, the Commission had no occasion to address, and did not address, the question whether a religious entity must incorporate under California's Nonprofit Religious Corporation Law (Corp. Code, § 9110 et seq.) in order to claim exemption from FEHA as a religious entity. McKeon misreads *Bohemian Club* as addressing the question by taking out of context a passage in which the Commission justified its interpretation of the exemption on policy grounds. "It is reasonable," the Commission explained, "that the Legislature might choose to exempt only religious non-profit corporations from the purview of [FEHA]. Religious non-profit corporations have always been accorded separate treatment under California's non-profit laws because of their unique protected status under the First Amendment to the United States Constitution. . . . The separate treatment of religious non-profit corporations, then, as the only exempt employers under [FEHA], continues a long and historical record of legislative deference to such activities." (*Bohemian Club*, *supra*, No. 88-01, FEHC Precedential Decs. 1988-1989, CEB 1, at p. 14.) This passage, read in context, merely justifies the Commission's conclusion that the statutory term "religious" (Gov. Code, § 12926, subd. (d)(1)) modifies both "association" and "corporation not organized for private profit," and that a nonreligious, nonprofit private club was not exempt. The decision cannot properly be read as authority for a point not considered.

McKeon also contends it makes sense as a matter of policy to require religious entities "to identify themselves as such and to make an election under the law that they are primarily religious . . . ." Because MHS recites in its articles of incorporation that it is organized "for public and charitable purposes," McKeon contends it should not be entitled to any accommodation extended by the Legislature to religious entities.[2]

However wise or unwise it might be to require religious entities to identify themselves as such through their method of incorporation, in fact no such requirement exists. To incorporate as a nonprofit religious corporation, an entity must include the following statement in its articles: " 'This corporation is a religious corporation and is not organized for the private gain of any person. It is organized under the Nonprofit Religious Corporation Law (primarily or exclusively [insert one or both]) for religious purposes.' " (Corp. Code, § 9130, subd. (b), bracketed text in original.) No provision of California law, however, precludes a religious entity from describing its purposes as "public or charitable" (Corp. Code, § 5130, subd. (b)) and incorporating as a nonprofit public benefit corporation (*ibid.*). By choosing to incorporate as a nonprofit public benefit corporation, an entity gives up the relatively high degree of freedom in the management of its own affairs, and freedom from oversight by the Attorney General, that religious corporations enjoy. (See Corp. Code, § 9230, subd. (a) ["the Attorney General shall have no powers with respect to" any nonprofit religious corporation except in the enforcement of criminal law and as set out in section 9230]; see also Assem. Select Com. on Revision of the Nonprofit Corporations Code, Rep. (1979) 5 Assem. J. (1979-1980 Reg. Sess.) pp. 9018-9019 ["One hallmark of . . . the entire part dealing with Religious Corporations is the fact that many statutory provisions are expressly made 'subject to the articles or bylaws'. Churches and other Religious Corporations are given leeway in providing for internal governance based on their own rules and beliefs."]; 9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, §§ 453-469, pp. 890-908, especially § 461, pp. 898-899.) But insofar as the Corporations Code and FEHA are concerned, this choice is left entirely to the discretion of those who organize the corporation.

---

[2]McKeon's argument proceeds from an erroneous assumption of fact. MHS's articles of incorporation also recite that its "specific and primary purposes" include "support[ing] the religious and charitable mission of the Sisters of Mercy of Auburn" and "conduct[ing] all of [its] activities . . . in a manner consistent with and supportive of the Mission and Philosophy of the Sisters of Mercy of Auburn, . . . and any other religious congregation(s) of the Roman Catholic Church that may, from time to time, participate . . . ." The Corporations Code does not forbid a nonprofit corporation from describing its corporate purposes both as "religious" and as "charitable." (Cf. Corp. Code, § 5130, subd. (b) [If a nonprofit public benefit corporation's "purposes include 'public' purposes, the articles shall . . . include a further description of the corporation's purposes."].)

McKeon also attempts to find support for her interpretation of FEHA's religious-entity exemption (Gov. Code, § 12926, subd. (d)(1)) in the language of Labor Code section 1102.1, a statute added in 1992. The Labor Code, however, neither resolves nor necessarily even assists in resolving the issue before us. Labor Code sections 1101 and 1102, in essence, forbid employers to attempt to control the political activities of employees. Labor Code section 1102.1, subdivision (a), declares that "[s]ections 1101 and 1102 prohibit discrimination or different treatment in any aspect of employment or opportunity for employment based on actual or perceived sexual orientation." Religious entities are excused from these requirements with an exemption evidently modeled on the religious-entity exemption contained in FEHA. The Labor Code, however, avoids the precise issue before us in this case with the following, italicized language: " 'Employer' . . . does not include a religious association or corporation not organized for private profit, *whether incorporated as a religious or public benefit corporation*." (Lab. Code, § 1102.1, subd. (b)(2), italics added.)

McKeon invites us to infer from this language that the Legislature intended Labor Code section 1102.1, subdivision (b)(2), to qualify the religious-entity exemption in FEHA (Gov. Code, § 12926, subd. (d)(1)). In adopting the Labor Code provision, she argues, the Legislature implicitly determined that the different language of the FEHA exemption does require incorporation under the Nonprofit Religious Corporation Law (Corp. Code, § 9110 et seq.). McKeon's position might be plausible if the Labor Code and FEHA exemptions had been drafted at the same time, rather than 15 years apart, or were part of the same statutory scheme. But they were not.

The most plausible explanation of the Labor Code's statement of exemption for religious entities is this: Having in mind the language of FEHA, the Legislature apparently recognized the issue we would later address in this case and added words to make clear that a religious entity need *not* incorporate under California's Nonprofit Religious Corporation Law (Corp. Code, § 9110 et seq.) to be exempt from Labor Code sections 1101 and 1102. MHS suggests the Legislature, in the Labor Code exemption, implicitly articulated its understanding of the true meaning of the FEHA exemption. To read the Labor Code in this way may be tempting, but it is also speculative and unnecessary. The language of the FEHA exemption means what the Legislature intended it to mean when first enacting it into law. At that time, as already explained, the exemption could not have been intended to require incorporation under the as-yet-unenacted Nonprofit Religious Corporation Law (Corp. Code, § 9110 et seq.). Nor, in any event, are the words of the exemption, read as if it had been enacted today, fairly susceptible to such an interpretation. (See *ante*, at pp. 325-326.)

In conclusion, nothing in the language or history of the religious-entity exemption appears to justify the conclusion that a religious entity, in order to claim exemption from FEHA, must incorporate as a nonprofit religious corporation. (See Corp. Code, § 9110 et seq.) Rather, the exemption (Gov. Code, § 12926, subd. (d)(1)) also benefits an organization of the requisite religious character that has chosen to organize itself in a different fashion. In holding to the contrary, the Court of Appeal erred.[3]

### III.

The judgment of the Court of Appeal is reversed.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.

---

[3]In her briefs to this court and the Court of Appeal, McKeon advanced three additional arguments against MHS's motion for summary judgment. Specifically, she argued: (1) FEHA's religious-entity exemption (Gov. Code, § 12926, subd. (d)(1)), despite its broad language, should be construed as exempting religious employers only with respect to claims of discrimination on religious grounds against employees with religious duties; (2) the establishment clauses of the federal and state Constitutions invalidate the exemption; and (3) MHS cannot be a "religious" entity within the meaning of FEHA (Gov. Code, § 12926, subd. (d)(1)) because the provision of health care is necessarily a secular activity, despite any religious purpose. Because McKeon did not raise these issues in the superior court, we do not reach them.