**BISHOP & ASSOCIATES, LLC, Appellant,**

**v.**

**AMEREN CORPORATION, Union Electric Company d/b/a Ameren Missouri, Ameren Services Company, James Armistead, Michael Wright, and Richard George, Respondents.**

### No. SC 95658

Supreme Court of Missouri, **en banc.**

Opinion issued June 27, 2017

Bruce A. Morrison of The Morrison Law Firm, St. Louis, MO.

Ameren was represented by Robert T. Har, Lisa A. Pake and Jozef J. Kopchick of Haar & Woods LLP, St. Louis, MO.

Amicus curiae briefs for St. Louis and Kansas City chapters of the National Employment Lawyers Association were represented by John D. Lynn of Sedey Harper Westhoff PC, St. Louis, MO.

Amicus curiae briefs for Missouri Coalition for the Environment was represented by Stuart P. Keating of Goodwin Keating LLC, St. Louis, MO.

Amicus curiae briefs for Missouri Business Legal Center, Associated Industries of Missouri and Edison Electric Institute were represented by David R. Bohm of Danna McKitrick PC, St. Louis, MO.

Patricia Breckenridge, chief justice

Bishop & Associates, LLC (B&A), filed a multi-count action against Ameren Corporation, Union Electric Company d/b/a Ameren Missouri, Ameren Services Company (collectively, Ameren), and James Armistead, Michael Wright, and Richard George (collectively, the supervisors) alleging wrongful discharge in violation of public policy, defamation, breach of the implied covenant of good faith and fair dealing, and tortious interference with a business expectancy. The suit arose after Ameren terminated its relationship with B&A, which provided commercial plumbing services at several of Ameren's facilities. The circuit court entered summary judgment in favor of Ameren and the supervisors on all counts. B&A appealed, asserting that independent contractors have a cause of action for wrongful discharge in violation of public policy and that the circuit court erroneously entered summary judgment on its claims of breach of the implied covenant of good faith and

Bishop was represented by Kenneth M. Chackes of Chackes Carlson LLP, and

fair dealing and tortious interference with a business expectancy.

The circuit court did not err in entering summary judgment in favor of Ameren and the supervisors. Missouri does not recognize a common law cause of action for wrongful discharge in violation of public policy for independent contractors. Missouri courts have always described the public policy exception as a narrow exception to the at-will employment doctrine. And although this Court expanded the exception to contract employees alleging wrongful discharge, this Court has never applied the public policy exception outside the context of an employer-employee relationship. This is consistent with most jurisdictions that have addressed whether independent contractors have a cause of action for wrongful discharge in violation of public policy and is supported by the fact that independent contractors are not as susceptible to coercion as at-will or contract employees.

Likewise, the circuit court did not err in entering summary judgment on B&A's claim of breach of the implied covenant of good faith and fair dealing. Because the purchase order expressly permitted Ameren to cancel the agreement with B&A at any time for any reason, there can be no breach of the implied covenant of good faith and fair dealing. Furthermore, despite B&A's claims to the contrary, Missouri case law does not support a breach of contract claim for wrongful termination in violation of public policy.

Finally, the circuit court did not err in entering summary judgment on B&A's tortious interference with a business expectancy claim. While B&A asserts that evidence in the record displays the supervisors' personal animus toward Mr. Bishop, such evidence does not establish a genuine issue of material fact as to whether the supervisors were acting out of personal, as opposed to corporate, interests. Therefore, B&A has failed to produce facts to establish the supervisors acted in their own self-interest and cannot prove an absence of justification for purposes of tortious interference. Accordingly, this Court affirms the circuit court's grant of summary judgment.

## Factual and Procedural Background

B&A is a limited liability company specializing in commercial plumbing. B&A employs Robert Bishop as a master plumber and drain-layer. In 2002, B&A entered into a purchase order with Ameren to "provide backflow testing on a schedule[d] basis and emergency service and/or preventative maintenance on an as-needed basis" at several of Ameren's facilities in Missouri and Illinois. The purchase order was non-exclusive, and Ameren could cancel it at any time for any reason by giving B&A 30 days advance written notice. At all times, B&A served Ameren as an independent contractor.

Mr. Bishop performed the majority of the plumbing services at Ameren's facilities. He prepared reports containing photographs and commentary related to each job he performed. In the reports, Mr. Bishop identified potential environmental and contamination issues at Ameren's facilities.

In 2005, Ameren and B&A entered into a "flex-time" arrangement in which B&A performed routine and recurring maintenance at several of Ameren's facilities. Under the arrangement, Ameren received a reduction in labor and equipment costs in exchange for B&A being allowed to schedule the maintenance during gaps or slow periods in B&A's schedule. Following the flex-time arrangement, nearly 100 percent of B&A workload was allocated to Ameren.

In February 2009, Michael Wright, the superintendent of building services for Ameren, sent Mr. Bishop an email stating that, due to the current economic conditions, Mr. Bishop should not perform any of the "yearly flex-time maintenance" at Ameren facilities without first getting permission from Mr. Wright. The email further stated Mr. Wright would consider the merits of having such maintenance performed on a case-by-case basis.

In January 2010, Mr. Bishop proposed to Ameren a three-year contract in which B&A would provide a two-man work crew onsite 40 hours per week. The proposed cost was $720,000 per year. Ameren rejected the proposed contract.

In May 2010, Mr. Bishop requested a meeting with James Armistead, a building maintenance supervisor, to discuss the proposed contract and additional concerns Mr. Bishop had about the "new direction" Ameren was taking in bidding out plumbing projects. Mr. Bishop prepared a letter detailing his concerns, including the reduction in business B&A received from Ameren and the potential risk and liability Ameren could incur by hiring other contractors and handymen who were less focused on preventative maintenance. Attached to the letter was a report Mr. Bishop compiled identifying plumbing and contamination problems at several of Ameren's facilities. Mr. Bishop also sought meetings with high-ranking Ameren officials to discuss the report and what B&A could do to prevent Ameren from incurring such liabilities.

On July 13, 2010, Mr. Bishop arrived at the Ameren facility in Alton, Illinois, to perform non-emergency maintenance services. Mr. Bishop was instructed to leave the facility because he did not notify Ameren in advance that he would be performing any maintenance that day. The following day, Mr. Wright emailed Mr. Bishop and reminded him he needed to contact management personnel before arriving to perform maintenance at Ameren facilities. Mr. Bishop responded it was the first he had been informed of the need to call ahead and it would not be beneficial for B&A if the maintenance had to be scheduled in advance.

On July 29, 2010, Ameren gave notice to B&A that Ameren was terminating its contract with B&A. B&A subsequently contacted the St. Louis County Department of Public Works and the United States Environmental Protection Agency and gave them a copy of the report detailing contamination and plumbing problems at Ameren facilities.

In 2012, B&A[1] filed a four-count petition against Ameren, Mr. Armistead, Mr. Wright, and Richard George, another of Ameren's building maintenance supervisors. B&A alleged Ameren wrongfully discharged B&A in violation of public policy because of Mr. Bishop's repeated reports to high level officials that documented environmental and public safety hazards at Ameren facilities. In the alternative, B&A alleged Ameren breached the implied covenant of good faith and fair dealing when it terminated its relationship with B&A. B&A also alleged the supervisors defamed B&A and tortiously interfered with its business expectancy by making statements that B&A was overly expensive, performed unnecessary work, used excessive equip-

---

1. In the original petition, Mr. Bishop and his wife, Kara Bishop, were also named as plaintiffs. Ameren and the supervisors subsequently filed a motion to dismiss the petition as to the Bishops because they lacked the legal capacity to sue. The circuit court sustained the motion, in part, and dismissed all claims alleged by Ms. Bishop and two of the counts alleged by Mr. Bishop.

ment and turned everything into a project to benefit itself.

Ameren and the supervisors moved for summary judgment, alleging they were entitled to judgment as a matter of law on all counts. The circuit court sustained Ameren's summary judgment motion. B&A appealed. After an opinion by the court of appeals, the case was transferred to this Court. Mo. Const. art. V, sec. 10.

## Standard of Review

This Court reviews summary judgment *de novo. Mickels v. Danrad*, 486 S.W.3d 327, 328 (Mo. banc 2016). Summary judgment is appropriate when "there is no genuine dispute about material facts and, under the undisputed facts, the moving party is entitled to judgment as a matter of law." *Parr v. Breeden*, 489 S.W.3d 774, 778 (Mo. banc 2016). A defendant is entitled to summary judgment when it establishes:

> (1) facts that negate any one of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements, or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense.

*ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 381 (Mo. banc. 1993) (emphasis omitted).

## The Public Policy Exception Does Not Extend to Independent Contractors

In its first point, B&A asserts the circuit court erred in sustaining Ameren's summary judgment motion because the cause of action for wrongful discharge in violation of public policy should be extended to independent contractors. In *Fleshner v. Pepose Vision Institute, P.C.*, 304 S.W.3d 81, 92 (Mo. banc 2010), this Court adopted the public policy exception to the at-will employment doctrine. The at-will employment doctrine provides that "at-will employee[s] may be terminated for any reason or no reason." *Id.* at 91. Under the public policy exception, an at-will employee has a cause of action in tort for wrongful discharge if he or she has been terminated "for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body" or "for reporting wrongdoing or violations of law to superiors or public authorities." *Id.* at 92.

In *Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 103 (Mo. banc 2010), this Court held contract employees also can pursue a cause of action for wrongful discharge in violation of public policy. The Court provided three reasons for expanding the wrongful discharge cause of action to contract employees: (1) "[a]n employer's obligation to refrain from discharging" employees who refuse to violate public policy "does not depend on the terms" of an employment contract; (2) the remedy for breach of contract is distinct from the remedy in tort for wrongful discharge; and (3) "[a]llowing contract employees to pursue a claim for wrongful discharge places at-will and contract employees on the same footing while also encouraging employers to refrain from coercing employees into a dilemma of choosing between their livelihoods and reporting serious misconduct in the workplace." *Id.* at 102-03.

B&A asserts that it is, likewise, logical to extend the wrongful discharge cause of action for violation of public policy to independent contractors. Missouri courts, how-

ever, have always described the public policy exception as a "narrow" exception to the at-will employment doctrine. *See Farrow v. Saint Francis Med. Ctr.*, 407 S.W.3d 579, 595 (Mo. banc 2013); *Margiotta v. Christian Hosp. Ne. Nw.*, 315 S.W.3d 342, 346 (Mo. banc 2010); *Fleshner*, 304 S.W.3d at 91; *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 872 (Mo. App. 1985). And although in *Keveney*, this Court extended the public policy exception to contract employees, it did not extend the public policy exception outside of the employer-employee relationship.

The circuit court granted summary judgment in part because no employer-employee relationship existed between B&A and Ameren. In doing so, the circuit court relied on *Farrow*. In *Farrow*, a nurse alleged wrongful discharge against her employer, the hospital, and her supervisor, a doctor. 407 S.W.3d at 587. This Court found the circuit court properly entered summary judgment on the nurse's wrongful discharge claim against the doctor because a "wrongful discharge cause of action requires an employer/employee relationship." *Id.* at 595 (internal quotation omitted). Because the doctor was the nurse's supervisor and not the nurse's employer, no employer-employee relationship existed between the nurse and the doctor; therefore, she could not bring a wrongful discharge cause of action against the doctor. *Id.*

Although *Farrow* did not involve an independent contractor, its reasoning reflects that Missouri courts view the wrongful discharge cause of action in the context of an employer-employee relationship. This is consistent with several other jurisdictions that have confined the wrongful discharge cause of action to situations involving employment relationships. *See MacDougall v. Weichert*, 144 N.J. 380, 677 A.2d 162, 166 (1996); *New Horizons Elecs.*

*Mktg., Inc. v. Clarion Corp. of Am.*, 203 Ill.App.3d 332, 149 Ill.Dec. 5, 561 N.E.2d 283, 285 (1990); *Abrahamson v. NME Hosps., Inc.*, 195 Cal.App.3d 1325, 241 Cal. Rptr. 396, 399 (1987).

In refusing to extend the wrongful discharge cause of action outside the employment relationship to independent contractors, other jurisdictions have focused on the inherent differences between employees and independent contractors: .

> Independent contractors typically have greater control over the way in which they carry out their work than employees, and businesses assume fewer duties with respect to independent contractors than employees. Thus, the independent contractor status provides the hiring party and the worker with an alternative relationship that gives each more freedom and flexibility than the employer-employee relationship. .

*Sistare-Meyer v. Young Men's Christian Ass'n of Metro. L.A.*, 58 Cal. App. 4th 10, 16-17, 67 Cal.Rptr.2d 840 (Cal.Ct.App. 1997) (internal citations omitted); *see also Harvey v. Care Initiatives, Inc.*, 634 N.W.2d 681, 684 (Iowa 2001). Likewise, a disparity in bargaining power traditionally exists between employers and employees in an employment relationship. *Harvey*, 634 N.W.2d at 684. In explaining the need for the public policy exception, Missouri courts have recognized this disparity in bargaining power. *See Keveney*, 304 S.W.3d at 103; *Boyle*, 700 S.W.2d at 878. That disparity is not present between independent contractors and their customers; therefore, independent contractors are not as susceptible to coercion as at-will or contract employees.

While B&A acknowledges the distinctions between independent contractors and employees, it insists this Court must recognize that some independent contractors need such protections, especially in situa-

tions such as B&A's in which the contractor has a continuing relationship with the client and is devoting a substantial portion of its work to one customer. But the fact remains that, as an independent contractor, B&A had the freedom to work for customers other than Ameren. Instead, B&A chose to devote the majority of its time to Ameren.

B&A also acknowledges that the majority of jurisdictions to address the issue have refused to extend the wrongful discharge cause of action to independent contractors. Nevertheless, it relies on two cases it contends exemplify state courts allowing independent contractors or other non-employees the right to sue for wrongful termination in violation of public policy. See *D'Annunzio v. Prudential Ins. Co. of Am.*, 192 N.J. 110, 927 A.2d 113 (2007); *Harper v. Healthsource N.H., Inc.*, 140 N.H. 770, 674 A.2d 962, 963-64 (N.H. 1996). But B&A's reliance on *D'Annunzio* and *Harper* does not support the extension of the wrongful discharge cause of action under Missouri common law.

In *D'Annunzio*, the New Jersey Supreme Court analyzed whether an independent contractor fit within the definition of "employee" under New Jersey's codified wrongful discharge cause of action—the Conscientious Employee Protection Act. 927 A.2d at 114. The act defines employee as "any individual who performs services for and under the control and direction of an employer for wages or other remuneration." *Id.* (quoting N.J.S.A. 34:19-2(b)). The court determined that, because the act was intended to be broad, remedial legislation, it must construe the term "employee" liberally. *Id.* at 119. It then concluded the plaintiff, although labeled as an independent contractor, presented evidence that the company had sufficient control over his day-to-day activities and, thereby, was an "employee" for purposes of the Conscien-

tious Employee Protection Act. *Id.* at 123. The court's holding in *D'Annunzio*, therefore, is limited to application of New Jersey's codified wrongful discharge cause of action and does not support the extension of Missouri's common law wrongful discharge cause of action.

Similarly, the New Hampshire Supreme Court's holding in *Harper* was specific to the statutory relationship between a physician and a healthcare organization. 674 A.2d at 966. In *Harper*, a health maintenance organization terminated its provider agreement with a physician without cause. *Id.* at 963-64. The physician brought suit on grounds the contract provision allowing for the termination of the provider agreement without cause violated public policy. *Id.* at 964. On appeal, the New Hampshire Supreme Court explained the relationship between the physician and the health maintenance organization was not, strictly speaking, an employer-employee relationship; nor was the surgeon acting as an independent contractor for the healthcare organization. *Id.* at 965. Rather, the physician was a "preferred provider" of healthcare for the health maintenance organization's customers, and such relationships were controlled by statute to ensure they were "fair and in the public interest." *Id.* at 965-67. The court reasoned that, because the public has a substantial interest in the relationship between physicians and health maintenance organizations, "public interest and fundamental fairness demand that a health maintenance organization's decision to terminate its relationship with a particular physician provider must comport with the covenant of good faith and fair dealing and may not be made for a reason that is contrary to public policy." *Id.* at 966. Therefore, the court concluded, if a physician's relationship with a healthcare maintenance organization "is terminated without cause and the physician believes that the decision to terminate was,

in truth, made in bad faith or based upon some factor that would render the decision contrary to public policy, then the physician is entitled to review of the decision." *Id.*

It follows that, like *D'Annunzio*, *Harper* was tailored specifically to the statutory relationship at issue. *Harper*, therefore, does not support the extension of the public exception doctrine to independent contractors.

Given the distinctions between independent contractors and employees and that the public policy exception is a narrow exception Missouri courts have applied only in the employer-employee context, the wrongful discharge in violation of public policy cause of action does not extend to independent contractors. Accordingly, the circuit court did not err in granting summary judgment on B&A's wrongful discharge claim.[2]

### Ameren Did Not Breach the Implied Covenant of Good Faith and Fair Dealing

■■ In its second point, B&A asserts the circuit court erroneously entered summary judgment with respect to its claim for breach of the implied covenant of good faith and fair dealing. "Under Missouri law, a duty of good faith and fair dealing is implied in every contract." *Arbors at Sugar Creek Homeowners Ass'n v. Jefferson Bank & Trust Co.*, 464 S.W.3d 177, 185 (Mo. banc 2015). "[T]here can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." *Id.* (internal quotation omitted).

The purchase order provides that Ameren "does not guarantee any minimum or maximum quantities and may cancel this order at any time for any reason by thirty (30) days advance written notice to" B&A. Under the express terms of the purchase order, Ameren had the right to cancel its agreement with B&A at any time for any reason by providing advanced written notice. B&A does not dispute that Ameren provided adequate advanced written notice. It follows that Ameren was acting in accordance with the express terms of the contract when it terminated its relationship with B&A.

B&A, nevertheless, relies on *Bishop v. Shelter Mutual Insurance Co.*, 129 S.W.3d 500 (Mo. App. 2004), for the proposition that a cause of action for breach of the implied covenant of good faith and fair dealing exists when the defendant alleges a violation of public policy. B&A's reliance on *Bishop* is misplaced.

In *Bishop*, an agent sued the insurance company for wrongful termination and breach of the implied covenant of good faith and fair dealing after the insurance company canceled its agency contract with the agent. *Id.* at 502. The circuit court entered summary judgment in favor of the insurance company. *Id.* In affirming the summary judgment, the court of appeals recognized that, in Missouri, a covenant of good faith and fair dealing is implied in every contract; nonetheless, Missouri also follows the at-will employment doctrine, which makes "the reason for an employee's termination ... inconsequential and irrelevant, unless the firing violates public policy." *Id.* at 505-06. It then explained that "Missouri law concerning at will employees may not be circumvented by an employee who alleges a contract of good faith and

---

2. Due to this Court's disposition of point I, this Court need not address B&A's third point in which B&A asserts the circuit court erred

when it dismissed its claim for punitive damages under the wrongful discharge cause of action.

fair dealings between the employer and employee." *Id.* at 506. The court of appeals concluded the gravamen of the agent's claim was he was wrongfully terminated and the "employment at-will doctrine cannot be so easily subverted" by masking his wrongful termination claim as a breach of the covenant of good faith and fair dealing. *Id.* at 507.

*Bishop*, therefore, stands for the proposition that a plaintiff cannot avoid the deficiencies in a wrongful discharge claim by reframing it as a claim of breach of the implied covenant of good faith and fair dealing. *Bishop* does not establish that Missouri law supports a breach of contract claim for wrongful termination in violation of public policy.[3] Consequently, the circuit court did not err in entering summary judgment on B&A's breach of the implied covenant of good faith and fair dealing claim because the fact that Ameren's actions were expressly permitted by the purchase order negates any claim by B&A that a breach occurred.

### The Supervisors Did Not Tortiously Interfere with B&A's Business Expectancy

In its fourth point, B&A asserts the circuit court erred in sustaining Ameren's motion for summary judgment with respect to B&A's claim for tortious interference with a business relationship against the supervisors. "Tortious interference with a contract or business expectancy requires proof of: (1) a contract or valid

business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. banc 1996).

"A defendant cannot be held liable for interfering with a business relationship if it has an unqualified right to perform the act." *Id.* "If the defendant has a legitimate interest, economic or otherwise, in the expectancy the plaintiff seeks to protect, then the plaintiff must show that the defendant employed improper means in seeking to further only his or her own interests." *W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 20 (Mo. banc 2012). "Improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Id.*

The circuit court concluded there was no competent evidence in the record indicating the supervisors' actions or statements were made to further only the supervisors' own interests as opposed to Ameren's interests. B&A asserts that, viewed in the light most favorable to B&A, the record supports the conclusion the supervisors were acting in their own interest. In support of its assertion, B&A relies on *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 253 (Mo. banc 2006), for the proposition

---

**3.** B&A also relies on two federal cases for the proposition that, "[u]nder Missouri law, a plaintiff properly pleads a breach of the implied covenant of good faith and fair dealing when he alleges the defendant's action violated public policy or a statute." *Kmak v. Am. Century Cos.*, 754 F.3d 513, 517 (8th Cir. 2014); *see also Smith v. City of Byrnes Mill, Mo.*, No. 4:14-cv-1220-SPM, 2015 WL 4715948, at *6 (Mo. E.D. Aug. 7, 2015). *Kmak* and *Smith*, however, rely on an erroneous

interpretation of the court of appeals' holding in *Bishop*. To successfully plead a breach of the covenant of good faith and fair dealing, a plaintiff must establish that the defendant "exercised a judgment conferred by the express terms of the agreement in such a manner as to evade the spirit of the transaction or so as to deny [the plaintiff] the expected benefit of the contract." *Mo. Consol. Health Care Plan v. Cmty. Health Plan*, 81 S.W.3d 34, 46 (Mo. App. 2002).

that evidence showing the defendant displayed "personal animus" toward the plaintiff is evidence the individual defendant was acting out of personal, as opposed to corporate, interests.

But this Court in *Stehno* did not hold that any evidence of personal animus establishes a defendant was acting out of self-interest in interfering with a business expectancy. Rather, this Court explained that "satisfying the absence of justification element requires a showing the defendant interfered with the business expectancy for 'personal, as opposed to corporate, interests.'" *Id.* (quoting *Eggleston v. Phillips*, 838 S.W.2d 80, 83 (Mo. App. 1992)).

Here, B&A asserts the following facts establish the supervisors acted out of self-interest: (1) the supervisors were intentionally targeting Mr. Bishop because they did not want to hear his reports of illegal conditions that needed to be remedied; (2) Mr. Armistead told Mr. Bishop to stop reporting his concerns about environmental violations; (3) Mr. George made condescending statements and used abusive language toward Mr. Bishop; (4) Mr. Bishop complained Mr. George was refusing to authorize necessary work, requesting illegal and improper work, and awarding work to a competitor based on Mr. Bishop's design; (5) Mr. Wright did not share the appreciation of B&A's diligence and protective approach as former Ameren managers had; (6) Mr. Armistead became "pissed" B&A reported to Ameren management that he had authorized one of the illegal and improper jobs; (7) Mr. Wright was antagonistic and had a "chip on his shoulder" toward B&A; and (8) Mr. Wright listed getting rid of Mr. Bishop as one of his accomplishments for the year. Even viewing these facts in the light most favorable to B&A, they do not establish the supervisors interfered with B&A and Ameren's business relationship out of self-interest.

The fact that the supervisors might not have liked Mr. Bishop does not establish their interference with B&A and Ameren's business relationship was for personal, as opposed to corporate, interests. *See Eggleston*, 838 S.W.2d at 83 (finding the fact that the defendants might not have liked the plaintiff did "not convert [the plaintiff's] discharge as an employee at will into an interference for personal, not corporate, reasons"). Therefore, because B&A has failed to produce facts to establish the supervisors acted in their own self-interest, B&A cannot prove an absence of justification for purposes of tortious interference. Accordingly, the circuit court did not err in entering summary judgment in favor of the supervisors.

## Conclusion

Ameren and the supervisors were entitled to judgment as a matter of law on B&A's claims of wrongful discharge in violation of public policy, breach of the implied covenant of good faith and fair dealing, and tortious interference with a business expectancy. Therefore, the circuit court did not err in entering summary judgment in favor of Ameren and the supervisors. This Court affirms the circuit court's judgment.

Fischer, Stith, Draper, Wilson and Russell, JJ., concur.

Powell, J., not participating.